**SO ORDERED.**

**SIGNED this 1st day of May, 2013.**



Robert E. Nugent
United States Chief Bankruptcy Judge

_____

DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:

DAWN MARIE POWELL,   ) Case No. 12-12716
                     ) Chapter 13
         Debtor.     )

**ORDER OVERRULING MID AMERICA CREDIT UNION'S OBJECTION TO
CONFIRMATION AND CONFIRMING DEBTOR'S CHAPTER 13 PLAN**

Two preconditions to the confirmation of chapter 13 plans are that they be proposed in good faith and that they pay secured creditors value that, as of the date of confirmation, will not be less than the amount of the creditor's allowed secured claim.[1] If the debtor offers the creditor a stream of payments, the payments must include a discount rate sufficient to allow recovery of the present value of the claim amount. Whether the plan has been offered in good faith turns on a variety of

---

[1] 11 U.S.C. § 1325(a)(3) and (5).

-1-

factors concerning the debtor's pre- and postpetition conduct, including the frequency of the debtor's previous filings and the debtor's motivation and sincerity in offering what the plan proposes. Dawn Powell filed this chapter 13 case 48 days after obtaining a purchase money car loan from Mid America Credit Union and a little more than two years after successfully completing a previous chapter 13 case. Her plan proposes that MACU's 10.99 percent contract interest rate be reduced to the "trustee's rate" of 4.75 percent.[2] MACU objects that the timing of her filing, combined with the precipitous rate reduction, demonstrates her lack of good faith. It also complains that the interest rate is insufficient under § 1325(a)(5)(B)(ii). Consideration of all of the circumstances surrounding Powell's filing shows that she proposed this plan in good faith and the proposed interest rate she offers is legally sufficient under § 1325 on the facts in this record. Her plan should be confirmed.[3]

Jurisdiction

Plan confirmation is a contested, core proceeding over which this Court may exercise subject matter jurisdiction.[4]

Findings of Fact

Dawn Marie Powell is a single mother and a rookie schoolteacher. In 2005, and while she was still married, she filed a joint chapter 13 case and completed the payments on her confirmed

---

[2] Because MACU's claim is a "910-car loan," its treatment is subject to the hanging paragraph, § 1325(a)(9)*, mandating that the amount of the debt, rather than the value of the collateral, be paid.

[3] A trial on confirmation of debtor's plan was held in February, 2013. The debtor appeared by her attorney Rick E. Hodge, Jr. Mid America Credit Union appeared by its attorney Eric Bruce. The chapter 13 trustee Laurie B. Williams appeared in support of confirmation.

[4] 28 U.S.C. § 157(b)(2)(L) and (b)(1) and § 1334.

plan even though she and her husband were divorced in 2006.[5] Powell had (and lost) a series of jobs during her prior case which, I note, spanned the financial collapse of 2008 and the resulting recession in the Wichita-area's economy that persists to this day. After she filed her 2005 case and was divorced in 2006, she lost her health insurance and incurred more debt. In addition to her own surgery during the prior chapter 13 case, she incurred debt for medical needs of her son, who suffers from a heart condition. Some of those creditors sued and at least one medical provider, Wichita Clinic, took a state court judgment against her in 2009. Powell received a discharge in the prior chapter 13 in August, 2010. She completed her education thereafter and became a student teacher in a local school district. At the time this case was heard, she had received her first teaching contract and continued to teach in that same school district.

Powell needed a car. On August 11, 2012, she purchased one at Davis-Moore Mazda, signing a Retail Installment Contract and Security Agreement ("Contract") that the dealer then assigned to MACU. She purchased a 2009 Mazda SUV for $17,578 and paid Davis-Moore an additional $2,499 for a service contract, financing the entire amount, plus dealer's fees and a GAP insurance premium. She put $500 down. For the first time, she was able to secure this loan without her mother's co-signature. The rate offered by MACU was 10.99 per cent for a 72-month period of repayment.[6] When MACU was assigned the Contract, it also received Davis-Moore's purchase money security interest in the vehicle.

When Powell bought the car, Davis-Moore assisted her in securing financing by taking her

---

[5] Case No. 05-16950.

[6] Powell's monthly car payments were $384 and according to her, were satisfactory for her budget. Her first car payment was due September 25, 2012. Ex. 2.

finance application and "shopping" the Contract to several local lending institutions so that they could "bid" for her business by offering finance terms. MACU's head loan officer testified and referred to this process as a "reverse auction." MACU apparently offered the most favorable terms and Powell agreed to them. He said that vehicle lenders do not peg their offered rates to the New York prime rate. He did not testify (and wasn't asked) about how MACU sets its rates.

The MACU loan officer also testified that while Powell's application did not disclose the Wichita Clinic judgment, her Transunion credit report did. He stated that he was "aware of her situation." The credit report not only discloses the judgment, but also her 2005 bankruptcy filing as well as a number of other debts she incurred after that filing.[7] In any event, MACU "bid" on the Contract and Powell accepted those terms.

Shortly after Powell bought the car and agreed to MACU's terms of repayment, Wichita Clinic garnished her pay at the school district, taking about $700; she had been employed with the school district about one month when the wage garnishment hit.[8] Powell realized that with the garnishments she would not be able to make her car payments. With her memory refreshed concerning the Clinic judgment, she then consulted counsel on September 11, 2012 and filed this case on September 27, 2012. Powell is a below median income debtor and her plan provides for monthly plan payments of $450 over 60 months.[9]

Because Powell obtained this car loan well-within 910 days of filing this case, her plan

---

[7] Ex. 4.

[8] According to the statement of financial affairs filed by Powell, the garnishment occurred in September and was in the amount of $551. Ex. B. Wichita Clinic had not previously garnished Powell's wages between 2010 and 2012.

[9] Ex. D.

-4-

provides for MACU to be paid the entire amount of its claim as it must.[10] It provides for MACU to be paid over the five year plan term, but only at 4.75 per cent interest. That rate is known as the "trustee's rate" and represents a risk adjustment of 1.5 percentage points added to the prime rate of 3.25 percent. MACU says that because its car loan rates are not tied to the prime rate, but are the product of a competitive market, it is entitled to receive a higher rate and, because Powell filed so soon after taking the car loan, MACU believes it should receive its contract rate of 10.99 per cent.[11] Apart from MACU's claim, Powell's plan provides for payment of her attorney's fees but unsecured creditors will receive no distribution under the plan.[12] The chapter 13 trustee supports confirmation of Powell's plan. She indicated that the plan is feasible at the 4.75% rate, but not the 10.99% contract rate sought by MACU.[13] It satisfies the requirements for confirmation, it pays MACU's claim in full, the debtor is current on her plan payments, and the trustee's rate complies with the Supreme Court's pronouncement in *Till*.[14]

Burden of Proof

As the plan proponent, the debtor bears the burden of establishing that her plan complies

---

[10] Dkt. 2. *See* § 1325(a)(9)* (The so-called "hanging paragraph" enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, prohibits bifurcation of the claim under § 506(a) and as a result, the entire debt is treated as an allowed secured claim under § 1325(a)(5)(B).).

[11] Dkt. 14.

[12] Ex. D. The unsecured claims total $60,363, of which approximately one-half is comprised of nondischargeable student loan debt. *See* Ex. F and Bankruptcy Schedule F.

[13] *See* Ex. F and G, comparing the trustee's plan projections at the 4.75% and 10.99% rates, respectively.

[14] *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004).

-5-

with the statutory requirements for confirmation.[15]

Analysis

**A. Filing chapter 13 shortly after obtaining a 910-car loan is not per se lack of good faith that bars confirmation under § 1325(a)(3).**

Courts in this Circuit look to a multitude of circumstances in examining whether a debtor lacked good faith in proposing a plan. Section 1325(a)(3) states that the plan may be confirmed if it was proposed in good faith and not by any illegal means. The Tenth Circuit long ago set out its eleven-factor test for lack of good faith under this subsection in *Flygare v. Boulden*, a test that remains good law today.[16] The factors to be considered include –

> (1) the amount of proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) *the frequency with which the debtor has sought relief under the Bankruptcy Reform Act*; (10) *the motivation and sincerity of the debtor in seeking Chapter 13 relief*; and (11) the burden which the plan's administration would place upon the trustee.[17]

But "the weight given each factor will necessarily vary with the facts and circumstances of each case."[18]

---

[15] *In re Alexander,* 363 B.R. 917, 922 (10th Cir. BAP 2007) (citing *In re Davis,* 239 B.R. 573, 577 (10th Cir. BAP 1999)); Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 217.1, SEC. REV. June 7, 2004, www.Ch13online.com.

[16] *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir. 1983).

[17] *Id.* at 1347-48 (quoting *In re Estus*, 695 F.2d 311, 317 (8th Cir. 1982)) [Emphasis added].

[18] *Id*. at 1348.

-6-

Case 12-12716    Doc# 30    Filed 05/01/13    Page 6 of 15

The *Flygare* factors that matter most in this case are Powell's multiple filings and her motivation and sincerity. Nothing before me suggests that she filed a second case for any purpose other than to stop the garnishment of her wages. While she appears to have run up considerable debt since 2005, that could be explained to some extent by her divorce-caused loss of health insurance (not an unfamiliar story in this court), her child's serious illness, her cost of obtaining a teaching degree, and her sporadic employment over the life of her first plan. That she completed the plan and obtained a discharge in the 2005 case is to her credit and should not count against her in this case. Likewise, Powell appeared to be a sincere debtor who is trying hard to put her life in order. Since filing in 2005, she has become a teacher who is employed full-time. She is a single mother. That she filed this case to stop a wage garnishment on a dischargeable debt can hardly be held against her.

As for MACU's objection that Powell's proposing to effectively reduce her car loan interest rate by 7.24 per cent evidences her bad faith, there is little authority to support that. As will be further discussed below, the rate she proposed is the standard rate for chapter 13 cases in this District and is rarely, if ever contested. That rate is based on the Supreme Court's plurality opinion in *Till v. SCS Credit* in which four justices concurred that the prime rate, adjusted for risk, is the appropriate way to determine what discount rate debtors should pay in order to satisfy the "value, as of the effective date of the plan" requirement contained in § 1325(a)(5).[19] One cannot fault the debtor here for proposing to repay her loan at the *Till* rate.

In some 910-car loan cases, the appropriate interest rate to be paid on the allowed claim has

---

[19] This reference to value incorporates the principle of the time value of money, requiring payments that incorporate an interest rate to account for the fact that a dollar paid today is worth more than a dollar paid tomorrow. *See Drive Financial Services, L.P. v. Jordan,* 521 F.3d 343 (5th Cir. 2008), citing *Till,* 124 S. Ct. at 1966.

-7-

Case 12-12716   Doc# 30   Filed 05/01/13   Page 7 of 15

crept into the good faith analysis. In *In re Blackmon*, the bankruptcy court concluded that in two separate cases, debtors' plans were not proposed in good faith where they filed bankruptcy within 79 and 75 days of purchasing vehicles financed at 19.95% and 11.65% respectively, and proposed to pay interest on the car claims at 5.25%.[20] In both cases, evidence was presented and the court found that debtors were contemplating bankruptcy at the time they purchased and financed their cars.[21] The bankruptcy court emphasized the factors of debtors' motivation and sincerity in seeking chapter 13 relief and the circumstances under which they contracted the debts. It concluded that debtors' plans, which proposed to pay less than the negotiated contract interest rates, were not "fundamentally fair" to the creditors, and denied confirmation for lack of good faith.[22]

Other cases, including *In re Marshall,* conclude that it is not bad faith per se, to purchase and finance a vehicle 40 days before bankruptcy, fail to make any prepetition payments, and propose to reduce the interest rate from the contract rate of 24.95% to 10.25%.[23] The car creditor argued that debtors' motivation in filing bankruptcy was for "welching" on the financing agreement and "cramming a low interest rate down the creditor's throat" and they did not otherwise need bankruptcy relief.[24] The bankruptcy court rejected the creditor's focus on "doing equity" and the prebankruptcy dealings between it and the debtors:

---

[20] 459 B.R. 144 (Bankr. S.D. Fla. 2011).

[21] In one of the cases, debtor met with and made a partial payment of fees to bankruptcy counsel before he purchased the vehicle. In the other, the debtor owed nearly $270,000 in unsecured debt and had a foreclosure judgment entered against him when he purchased his vehicle. 459 B.R. at 146.

[22] 459 B.R. at 147.

[23] 2007 WL 1725196 (Bankr. C.D. Ill. 2007).

[24] *Id.* at *1.

-8-

> The present value requirement of Section 1325(a)(5)(B)(ii) is applied as dictated by *Till* [full cite omitted]. It is intended to compensate secured creditors for the delay in payments, in recognition of the fundamental economic principle that money paid tomorrow is worth less than if paid today. The equities of the case have no role to play in the interest rate calculation. Who mistreated whom is simply not relevant.[25]

The bankruptcy court also noted that the predominant purpose of the bankruptcy filing was not to deal with the car debt. Rather, debtors filed chapter 13 to save their house (addressing a $144,000 mortgage with an arrearage and tax delinquency) and deal with unsecured debt that was twice the amount owed on the car loan. The court denied the car creditor's objection to cramdown of the interest rate and confirmed the plan.[26]

In the current case, there is no evidence that debtor was contemplating filing bankruptcy at the time she purchased her car. Here, debtor's motivation in filing bankruptcy was to stop a judgment creditor's wage garnishment, a judgment creditor that MACU was well aware of when it extended the credit to debtor.[27] That garnishment occurred after debtor purchased the vehicle and debtor knew that she would not be able to make the car payments if she were subjected to garnishments. In addition, there was no evidence that bankruptcy was filed for the sole purpose of

---

[25] *Id.* at *2.

[26] *See also, In re Johnson,* 438 B.R. 854 (Bankr. D. S.C. 2010) (under totality of circumstances, filing of bankruptcy after purchase of 910-vehicle was not bad faith; bankruptcy filing was motivated by need to address tax debt and debtor was not engaged in extravagant lifestyle); *In re Melton,* 2010 WL 5128631 (Bankr. D. S.C. 2010) (The fact that debtor purchased a used BMW with significant mileage shortly before filing bankruptcy is not dispositive of the issue of bad faith; other circumstances were present, however, which debtor did not satisfactorily explain to satisfy her burden of proving that the plan was proposed in good faith.); *In re Robinson,* 2008 WL 2095349 (Bankr. D. Kan. 2008) (It is not bad faith per se for debtor to allow dismissal of bankruptcy case and then refile after the 910-day period has passed, avoiding the application of the hanging paragraph and enabling debtor to bifurcate the car claim).

[27] Powell's Schedule F discloses that the Wichita Clinic judgment was approximately $5,000.

avoiding the contract rate of interest. In any event, the hanging paragraph only prohibits bifurcation of a 910-car loan claim under § 506. It does not prohibit cramdown or modification of the contract terms of a 910-car loan.[28]

> **B.** **The applicable rate of interest in this case is the *Till* rate; *Till* makes clear that contract, cost of money or other similar standards do not apply to § 1325.**

In 2004, the United States Supreme Court entered the interest rate discussion with *Till v. SCS Credit Corp*.[29] In a split decision, the high court held that a secured creditor in a Chapter 13 case was entitled to receive a discount rate equal to the national prime rate plus a risk adjustment – a formula-based approach. Till was a chapter 13 case, making its reasoning applicable here. In *Till*, three justices joined Justice Stevens' opinion that rejected the use of "coerced loan, presumptive contract rate, and cost of funds approaches."[30] Concluding that each of these approaches "is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value,"[31] Justice Stevens

---

[28] Indeed, modification of the repayment terms is expressly permitted by the Code. *See* § 1322(b)(2); *In re Velez,* 431 B.R. 567 (Bankr. S.D.N.Y. 2010) (hanging paragraph does not prohibit modification of interest rate on 910-car loan from 24.99% to 5.75%.); *In re Johnson,* 337 B.R. 269 (Bankr. M.D.N.C. 2006) (Even if bifurcation of 910-car claim is prohibited, a plan may still modify the term of the loan and interest rate); *In re Robinson,* 338 B.R. 70 (Bankr. W.D. Mo. 2006) (debtor not required to pay the contract interest rate on 910-car loan); *In re Brill*, 350 B.R. 853 (Bankr. E.D. Wis. 2006) (*Till* is appropriate interest rate to satisfy present value requirement of § 1325(a)(5)(B)(ii), not the contract rate); *In re Bufford*, 343 B.R. 827 (Bankr. N.D. Tex. 2006) (hanging paragraph does not alter the present value requirement of § 1325(a)(5)(B)(ii) or the ability to modify a 910-car creditor's contractual rights under § 1322(b)(2)); *In re Vandernick,* 2008 WL 901685 at *4 (Bankr. N.D. W. Va. 2008) (hanging paragraph does not prohibit modification of interest rate).

[29] 541 U.S. 465, 124 S. Ct. 1951, 158 L.Ed. 2d 787 (2004).

[30] 541 U.S. at 477.

[31] *Id.*

preferred beginning with the national prime rate that is widely reported and enhancing it with a risk factor. His opinion noted that the prime rate reflects the financial market's estimate of what a commercial bank should charge a creditworthy borrower to compensate for opportunity costs, inflation risk, and a slight risk of default.[32] Debtors posing a greater default risk should pay a higher rate that is adjusted for "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."[33] The four justices stated that unlike the other approaches, "the formula approach entails a straightforward, familiar, and objective inquiry" that "depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor."[34] A fifth justice, Justice Thomas, concurred in the judgment. In a separate opinion, he questioned whether there was any statutory justification for any risk adjustment, but he concluded that because the rate allowed by the four-justice plurality opinion was higher than the risk-free prime rate, the creditor was receiving the requisite present value to satisfy § 1325(a)(5).[35]

After enactment of BAPCPA in 2005 and its new treatment of 910-car loans, the question arose whether *Till's* "prime-plus" interest rate continues to apply to 910-car loans or whether the contract rate of interest applied.[36] Many bankruptcy courts have concluded that the *Till* formulation

---

[32]*Id.* at 479.

[33]*Id.*

[34]*Id.*

[35]*Id.* at 490-91.

[36] Courts have applied *Till* in cases where the contract rate of interest on the 910-car loan is *less* than the market prime rate, resulting in the *Till* rate of interest being more than the contract rate. *See e.g., In re Taranto,* 365 B.R. 85 (6th Cir. BAP 2007) (Court held that *Till* rate of interest would govern even though the contract proposed a 0% interest rate; case remanded for

-11-

remains applicable in chapter 13 cases filed post-BAPCPA.[37]

MACU's arguments regarding the proposed interest rate are based on two assertions: first, that car loan rates are related to an auction-like market and not the prime rate; and second, that the risk adjustment included in the current trustee's rate does not sufficiently protect the credit union in this case. The first argument ignores *Till*'s holding that a determination of the appropriate rate under § 1325(a)(5) involves the straightforward inquiry based on the financial markets, the estate's circumstances, and the loan's characteristics instead of the lender's "circumstances or its prior interactions with the debtor."[38] MACU's contract rate was determined by the reverse auction that its witness described and is part of the "prior interactions" or lender's circumstances that *Till* tells us to disregard in favor of the conditions of the financial marketplace.

---

determination of *Till* rate); *In re Brill,* 350 B.R. 853 (Bankr. E.D. Wis. 2006) (*Till* rate of interest applies in cases where contract rate of interest is below prime; contract rate of interest was 0%); *In re Scruggs,* 342 B.R. 571 (Bankr. E.D. Ark. 2006) (same).

[37] *See e.g. In re Murray,* 352 B.R. 340 (Bankr. M.D. Ga. 2006) (BAPCPA hanging paragraph's anti-bifurcation provision did not affect continued applicability of *Till* to satisfy the present value requirement of § 1325(a)(5).); *In re Robinson,* 338 B.R. 70 (Bankr. W.D. Mo. 2006) (BAPCPA amendments did not mention interest rates or overrule *Till;* creditor's entitlement to receive full "value" of their claim under § 1325(a)(5) does not require payment of contract rate of interest); *In re Lilly,* 378 B.R. 232 (Bankr. C.D. Ill. 2007) (*Till's* prime plus risk approach remains applicable following enactment of BAPCPA); *In re Vagi*, 315 B.R. 881 (Bankr. N.D. Ohio 2006) (*Till's* formula approach continues to apply to 910 claims; hanging paragraph did not address rate of interest to which creditor is entitled and did not prevent modification of contract interest); *In re Soards,* 344 B.R. 829 (Bankr. W. D. Ky. 2006) (*Till* analysis remains valid post-enactment of BAPCPA); *In re Brown,* 346 B.R. 246 (Bankr. M.D. Ga. 2006) (No provision of BAPCPA prohibits the modification of secured creditors' rights under § 1322(b)(2); BAPCPA did not abrogate *Till*). The Fifth Circuit Court of Appeals has also weighed in on the applicability of *Till* post-BAPCPA and concluded that its prime-plus approach applies in chapter 13 cases filed after enactment of BAPCPA. *See Drive Financial Services, L.P. v. Jordan*, 521 F.3d 343, 348 (5th Cir. 2008) (Hanging paragraph and BAPCPA did not supercede *Till*).

[38] *Till,* 541 U.S. at 479.

-12-

MACU's second argument, that the 1.5% risk adjustment does not sufficiently reflect the risk that Powell's loan will not be repaid, is less easily dismissed. While the *Till* plurality considered that a risk adjustment between one and three percentage points would likely be a sufficient range, it is not clear from the opinion that a risk adjustment can never exceed three points. Indeed, some bankruptcy courts have held as much.[39] Instead, *Till* supplies us with guideposts for determining how to monetize the risk to secured creditors that is inherent in chapter 13 plans. The first one is the prime rate which is widely reported and easily ascertained and reflects what a creditworthy commercial borrower might pay a commercial lender "to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." The second guidepost is the risk adjustment that recognizes the fact that a chapter 13 debtor likely poses a greater risk than a creditworthy commercial borrower, allowing the bankruptcy court to adjust the rate upward in consideration of the nature of the security, the circumstances of the estate, the duration of the plan and its feasibility. Bankruptcy courts must therefore carefully tread the border between compensating the creditor for its risk and pricing the debtor out of her plan.[40]

MACU provided no evidence of what the appropriate risk rate is and relies only on its assertion that the contract rate adequately liquidates it while the Trustee's rate does not, leaving me

---

[39] *See In re Horny,* 2011 WL 6643074 at *1 (E.D. Mich. 2011) (upholding an agreed-to interest rate of 15.2 percent between debtor and creditor, a risk factor of nearly 12% over prime; holding that *Till* does not proscribe a risk factor higher than 3 percent over prime, if such a rate is necessary to account for the risk of nonpayment and is not too high for the plan to succeed); *In re Burt,* 2008 WL 4365894 (Bankr. N.D. Miss. 2008) (adding a 4.25% risk factor to 5.25% prime rate).

[40] *See Till*, 541 U.S. at 480 (secured creditor is entitled to be compensated for the risk factor unless it is so high as to "doom the plan.").

-13-

little with which to work.[41] The debtor has recently completed a first chapter 13 case and obtained a discharge. During that case, she accumulated substantial new debt and filed very shortly after receiving this car loan because one of those creditors had taken a judgment about which she forgot. She is a new employee and potentially at higher risk of dismissal due to her lack of seniority. All of these facts, including her prior bankruptcy, potentially enhance MACU's risk and were known to it when it made the loan.

But, increasing her risk rate add-on would likely jeopardize Powell's ability to complete her plan. She is a below-median debtor whose projected disposable income is predicated on what she discloses on schedules I and J. Those schedules indicate that her monthly surplus is $428. By law, her applicable commitment period is three years, yet she proposes to pay for five years. Her proposed payments are $450. Based upon the plan calculations offered in evidence by the Trustee, it does not appear that she can afford to pay any more. Increasing the risk adjustment would likely doom the plan to failure.

MACU's interest in the collateral appears to be well-protected. Consider that it agreed prepetition to finance an already three-year-old vehicle until July of 2018 for only $500 down. But under Powell's plan, the car will be paid for not later than September of 2017 when the plan ends, ten months sooner. MACU may lose some yield, but that is part of its contractual right to the benefit

---

[41] *See Till,* 541 U.S. at 479, 484-85 (the creditor, as the more knowledgeable party, bears the evidentiary burden to support a higher risk factor); *In re Bivens,* 317 B.R. 755 (Bankr. N.D. Ill. 2004) (creditor failed to satisfy its burden of showing that risk factor added to prime rate was inadequate to compensate creditor for risk of debtor's default under her chapter 13 plan); *In re Johnson,* 438 B.R. 854, 859 (Bankr. D. S.C. 2010) (risk factor adjustment referenced in *Till* is the risk that the chapter 13 plan will not succeed and is not the same risk of nonpayment as creditworthiness factors taken into account in the lending decision).

-14-

of its pre-bankruptcy bargain, one that is not entitled to adequate protection.[42] And, if deterioration of the collateral is a concern (which seems unlikely), MACU has already financed a $2,499 warranty that, at least according to those who sell them, should protect Powell's "investment" in the vehicle.

Thus, considering the nature of the security, Ms. Powell's estate's circumstances, the length of her plan, and its feasibility, the proposed stream of payments at the Trustee's rate is sufficient to return to MACU the value of its allowed secured claim in this case. MACU's objections should be OVERRULED and Dawn Powell's plan CONFIRMED. The Trustee will submit the appropriate order on confirmation.

# # #

---

[42] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.* 484 U.S. 365 (1988) (undersecured creditor not entitled to interest on its collateral as compensation for delay in foreclosing on collateral caused by automatic stay).